# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Signature Marketing, Inc. d/b/a**
**Signature Manufacturing,**

        **Plaintiff,**

**v.**                                      **Case No. 15-7200-JWL**

**New Frontier Armory, LLC; and**
**EXTAR, LLC,**

        **Defendants.**

## MEMORANDUM & ORDER

Plaintiff filed this suit alleging that defendants breached a contract between the parties under which plaintiff agreed to manufacture and provide custom firearm component parts to defendants in exchange for payment for those component parts. Defendants counterclaimed against plaintiff for breach of implied warranties. This matter is presently before the court on defendants' motion for partial summary judgment on plaintiff's breach of contract claim (doc. 147); plaintiff's motion for partial summary judgment on defendants' counterclaims (doc. 153); and defendants' motion to exclude the testimony of plaintiff's damages expert (doc. 149).[1]  As will be explained, defendants' motion for partial summary judgment is granted with respect to plaintiff's promissory estoppel claim and is otherwise denied;[2] plaintiff's motion for partial summary judgment on defendants' counterclaims is granted in part, denied in part and moot in

---

[1] Plaintiff's motion to exclude the testimony of non-retained experts is also pending before the court and will be resolved by separate order.

[2] In response to defendants' motion for partial summary judgment, plaintiff has expressly abandoned its promissory estoppel claim. This aspect of the motion, then, is granted as unopposed.

part; and defendants' motion to exclude the testimony of plaintiff's damages expert is granted in part and denied in part.

## I.      Applicable Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Water Pik, Inc., 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id.* at 1143-44.

## II.     Facts

Consistent with the standard articulated above, the following facts are either uncontroverted or related in the light most favorable to the non-moving party. Plaintiff (and counterclaim defendant) Signature Marketing, Inc. ("SMI") is located in Merriam, Kansas and is a federally licensed manufacturer of firearms and firearm components.  Mike Everhart is the owner of SMI.  Defendant (and counterclaim plaintiff) New Frontier Armory, LLC ("NFA") is located in North Las Vegas, Nevada and is a firearms dealer and distributor.  David Famiglietti

is a co-owner of NFA.  Defendant (and counterclaim plaintiff) EXTAR, LLC ("EXTAR") is located in Arizona and is a firearms manufacturer.   Bryan Zeman owns EXTAR.  The vast majority of the dealings between and among the parties in this case consist of electronic communications between Mssrs. Everhart, Famiglietti and Zeman.

In 2012, Mr. Zeman at EXTAR conceived, designed and began developing a custom "short pistol"—a firearm that is based on an AR-15 platform but is the size of a pistol rather than a rifle.  NFA was designated as the exclusive distributor of the pistol and the record reflects that Mr. Famiglietti assisted Mr. Zeman in getting the "pistol project" up and running.  Toward that end, Mr. Famiglietti contacted SMI in late July 2012 looking for "complete bolt assemblies" for the pistol project.  A complete bolt assembly includes a bolt body with additional smaller parts including an ejector, ejector springs, ejector retainer pin and gas rings.  Mr. Famiglietti suggested that NFA was anticipating sales of 5000 short pistols per month and would need between 2000 and 5000 bolt assemblies per month.  He suggested that the pistol project would begin in 30 to 60 days.  Separately, Mr. Famiglietti also inquired about obtaining "bolt carrier groups" or "BCGs" for NFA's immediate use in connection with rifles that NFA was already selling.  A bolt carrier group includes a complete bolt assembly inside a carrier and includes other small parts such as a cam pin, firing pin, firing pin retainer and gas key.

In August, NFA and SMI had agreed on pricing and other terms with respect to the BCGs.  Mr. Famiglietti submitted a purchase order to Mike Everhart at SMI and, at Mr. Everhart's request, attached to that purchase order certain terms and conditions required by SMI. The purchase order was signed by Mr. Famiglietti on August 26, 2012 and indicated that NFA would purchase BCGs in a quantity of "500/mo" for a minimum term of 12 months.  When Mr.

Famigliette expressed an interest in moving forward solely on the purchase order for the BCGs and holding off on a purchase order for the bolt assemblies (because NFA was "waiting on funding" for the pistol project), Mr. Everhart advised that the quotes for the BCGs and the bolt assemblies were "tied together" in terms of pricing and delivery and that the low pricing reflected in the quotes was based on SMI acquiring new equipment, at substantial expense, to increase the speed of the manufacturing process. Mr. Everhart indicated that he understood the need to "adjust the timing" on the bolts but that he needed a firm commitment on the bolt assemblies that he could "take to the bank" to move forward with the purchase of new equipment.  Mr. Famiglietti then signed an August 26, 2012 purchase order for bolt assemblies in a quantity of "5000/mo" for a minimum term of "12 mo @ 500 units per mo or total of 6k units."  That purchase order also contained the terms and conditions required by SMI.  Mr. Famiglietti asked Mr. Everhart to begin work immediately on the BCGs and that he would provide a start date on the bolt assemblies in the next few weeks.

In late September 2012, NFA was still attempting to secure funding for the pistol project and indicated to SMI that they would be submitting payment for the first set of bolts in one to two weeks.  NFA also inquired at that time about the status of the first set of 500 BCGs.  Mr. Everhart promised the delivery of 500 BCGs within 10 to 14 days.  With respect to the bolts, Mr. Everhart asked for a more specific time line in terms of when NFA would need the bolts and whether Mr. Everhart should start looking for "other contracts" to fill up his new machines and keep those machines running.  In early October 2012, Mr. Famiglietti responded that he had secured funding for the pistol project and that he wanted to "start seeing" bolts in early November if possible.  Toward that end, Mr. Famiglietti indicated that he would send a deposit

for two "batches" of 2000 bolt assemblies but intended to "bump up" to 5000 bolt assemblies per month.  NFA wired a deposit for the bolt assemblies on October 10, 2012 representing 50% of the cost of 2000 bolt assemblies as well as a deposit for the initial 500 BCGs.  In large part, the BCG-related transactions between SMI and NFA were fairly smooth over the course of the next several months.  The record reflects that NFA was "happy" with those products and that NFA was selling the BCGs "within days" of getting the BCGs from SMI.[3]

On November 1, 2012, Mr. Famiglietti "introduced" Mr. Everhart to Mr. Zeman via email. Mr. Famiglietti indicated to Mr. Everhart that Mr. Zeman would be manufacturing the pistols for which Mr. Everhart was producing the bolts.  According to Mr. Famiglietti, NFA would be "taking care" of the billing for the bolts, but SMI would ship the bolts to EXTAR's facility in Arizona.  Mr. Famiglietti also indicated that Mr. Zeman wanted to visit with Mr. Everhart about manufacturing a custom bolt carrier for use in the short pistol. Beginning in early November 2012, Mr. Zeman began sending drawings of a potential custom carrier to Mr. Everhart.  Throughout November, Mr. Zeman submitted drawings and various adjustments concerning the custom carrier to Mr. Everhart.  During this same time frame, Mr. Famiglietti inquired about certain specifications concerning the BCGs so that he could pass that information on to his customers.  In a detailed email dated November 19, 2012, Mr. Everhart identified, among other things, that the material utilized for the bolt portion of the carrier group was "9310

---

[3] In January 2013, SMI recalled a batch of bolts that had been utilized in the BCGs.  The record reflects that SMI sent replacement bolts to NFA and that NFA substituted those replacement bolts for the "bad" bolts in the BCGs.  In March 2013, NFA notified SMI of some "minor" problems they experienced with the BCGs after swapping out the bolts.  While some of these issues are the subject of a portion of NFA's damage claim, this aspect of the parties' relationship is not directly relevant to the motions before the court.

or 4130/4140." He explained that he was not using the "mil spec" carpenter 158 material for the bolts for specific reasons which he detailed in the email.  The record does not reflect that NFA ever complained about or objected to the material utilized for the bolts.

By the end of November, SMI was ready to deliver the first 2000 bolt assemblies for the pistol project. At that time, Mr. Everhart sent a quote to Mr. Zeman for the production of the short carriers.  He sent a revised quote on December 4, 2012.  That quote contained the following language:  "To accept this quotation, sign & date here and return."  It is uncontroverted that neither Mr. Zeman nor anyone else ever signed the quote.  The quote called for the production of 2000 short carriers per month for the first two months and then 4000 short carriers per month for the next 10 months.  When Mr. Everhart did not hear back from Mr. Zeman about the quote, he sent an email on December 6, 2012 asking whether Mr. Zeman had received the quote.  In response, Mr. Zeman, on December 7, 2012, emailed:  "Receive check OK?"  The record reflects that Mr. Zeman was referencing a check representing a 50 percent deposit on 2000 short carriers.  SMI received that check.  In late January 2013, Mr. Zeman made additional changes to the custom carrier design and directed Mr. Everhart to begin production of the custom carrier.  The record reflects that SMI shipped nearly 1000 carriers in mid-March 2013 and the remaining carriers (of the 2000 carriers) in mid-April 2013.

In May 2013, the parties' relationships began to deteriorate as NFA began complaining about accounting issues with SMI and SMI began voicing strong concerns about EXTAR's failure to pay for any carriers it had received and its lack of communication about that issue.  In response, Mr. Famiglietti essentially blamed SMI for the delay in releasing the short pistol but assured Mr. Everhart that EXTAR's account would be paid in full by Mr. Zeman as soon as

possible.  The record reflects that NFA and SMI, by the end of May 2013, were able to work through most of the accounting issues and SMI resumed sending monthly orders of BCGs to NFA.  Plaintiff's evidence demonstrates that Mr. Zeman continued to ignore Mr. Everhart's communications concerning payment for the carriers.  On June 8, 2013, Mr. Famiglietti promised to speak to Mr. Zeman about payment.

On July 1, 2013, Mr. Zeman contacted SMI about payment, asking for the same patience that Mr. Zeman extended to SMI when "delivery was delinquent."  During this same time frame, Mr. Famiglietti advised Mr. Everhart about numerous problems that had arisen with the 2000 bolts when those bolts were utilized in the short pistol.  Specifically, Mr. Famiglietti notified Mr. Everhart that the extractor pins were too soft; the bolts themselves were breaking apart after a limited number of rounds in light of hardness and material issues; and the cam pin holes were severely "offset," which caused other problems.  The parties spent several days discussing the best way in which to remedy the situation.  Mr. Everhart urged NFA and EXTAR to return the bolts for replacement and inspection by SMI.  Ultimately, Mr. Famiglietti indicated that he was not interested in any replacements and found another supplier for bolts.  This lawsuit followed.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

### III.    Defendants' Motion for Partial Summary Judgment

Defendants move for summary judgment on two limited issues:  that the "quote" for the short pistol did not constitute a contract because the quote specified an exclusive manner of acceptance that defendants did not utilize and that plaintiff's recoverable damages are limited by

7

the terms and conditions that governed the parties' relationship.  As a threshold matter, defendants move the court to strike plaintiff's response to their statement of uncontroverted facts, asserting that plaintiffs' response is procedurally defective.  Defendants complain that plaintiff's response does not unequivocally admit or deny defendants' factual statements and incorporates additional facts in response to defendants' facts without setting forth those facts in separately numbered paragraphs (plaintiffs' additional facts are simply set forth in the responses corresponding to defendants' facts).  The motion is denied and the court finds no deficiency in plaintiff's response.  For those facts that are not controverted, plaintiff has clearly indicated that the fact is not controverted.  For those facts that are controverted, plaintiff has set forth facts, with citation to the record, tending to dispute defendants' facts.  While plaintiff did not utilize the word "controverted" prior to setting forth its facts, it is clear that plaintiff controverts the fact by virtue of plaintiff's own factual statements in response.  The court also rejects defendants' argument that plaintiff's responsive facts contain improper argument, legal conclusions and unsubstantiated allegations.  Finally, the court notes that the facts set forth in defendants' motion are incredibly limited in both scope and number (due to the limited issues raised in the motion), the parties do not dispute the vast majority of the pertinent facts in any event, and defendants' reply reflects that they were not inhibited in any way in addressing the factual issues raised in plaintiff's response.

A.    *Whether Plaintiff's Offer Specifies an Exclusive Manner of Acceptance*

In connection with its breach of contract claim, plaintiff asserts that a contract was formed between the parties when Mr. Zeman accepted plaintiff's December 4, 2012 quote by

responding to the quote via email and sending a check to plaintiff in an amount representing a 50 percent deposit on the first month's order, as specified in the quote. In their motion for summary judgment, defendants contend that no contract was formed concerning the December 4, 2012 quote because defendants never satisfied the acceptance provision contained in the quote—namely, the provision that stated "To accept this quotation, sign & date here and return." It is undisputed that defendants never signed, dated or returned the written quote. As will be explained, the quote does not unambiguously specify that signing, dating and returning the quote is the exclusive manner of acceptance. Thus, acceptance could be made by any reasonable means and summary judgment is denied.[4]

Article 2 of the Uniform Commercial Code ("UCC"), adopted by Kansas and applicable to the transactions at issue in this case, sets forth a "liberal policy toward contract formation" and provides that the parties can make a contract for the sale of goods "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." K.S.A. § 84-2-204(1). Generally, the question of whether a contract was formed is a question of fact for the jury. *Price v. Grimes*, 677 P.2d 969, 974 (Kan. 1984). But defendants' motion for summary judgment presents a threshold issue for the court—whether the language utilized in plaintiff's quote specified a permissive or exclusive manner of acceptance. *See Einsel v. Einsel*, 374 P.2d 612, 619 (Kan. 2016) (interpretation of all written instruments presents a question of law). If the specified manner is permissive, then the fact that defendants

---

[4] Defendants have not moved for summary judgment on whether they accepted plaintiff's offer through their words and conduct. Clearly, this is a jury question in light of disputed facts underlying this issue.

did not sign, date and return the quote but may have accepted the offer in some other manner does not render the attempted acceptance ineffective.  2 Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 2-206:58 (3rd ed. 2012).  In other words, a contract may exist even though defendants did not accept in the manner specified on the quote.  *See id.*  If, however, the designated manner of acceptance is exclusive, then no contract was formed in this case because defendants undisputedly did not utilize the manner specified.  *See id.* (if the manner of acceptance is exclusive, there is no acceptance unless that manner is followed, even though it is perfectly clear that the offeree intended to accept and even though the manner of acceptance is otherwise reasonable).[5]

A condition that an offer must be accepted in an exclusive manner must be expressly stated.  *See id.*  Pursuant to Article 2,

> Unless otherwise *unambiguously indicated* by the language [of the offer] or circumstances
>
> > (a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances.

K.S.A. § 84-2-206(1)(a) (emphasis added).  As the official commentary to that section provides, "[a]ny reasonable manner of acceptance is intended to be regarded as available unless the offeror has made quite clear that it will not be acceptable."  *Id*. cmt. 1.  The comment further indicates that this "flexible" rule as to acceptance was intended to replace former technical rules "as new media of communication develop or as the more time-saving present day media come

---

[5] In this circumstance, however, defendants may be found to have made a counteroffer through their communications subsequent to the receipt of plaintiff's quote.  2 Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 2-206:62 (3rd ed. 2012) (if exclusive method of acceptance is not employed, acceptance by any other manner has the effect of a counteroffer and contract may then arise from offeror's assent to irregular acceptance).

into general use." *Id*.  The question for the court, then, is whether plaintiff's quote "unambiguously" invites acceptance of the offer by only one means—the signing, dating and returning of the quote.

In support of their argument that the quote specifies an exclusive manner of acceptance, defendants direct the court to three cases—*Wachter Management Co. v. Dexter & Chaney, Inc*., 144 P.3d 747 (Kan. 2006); *Home Basket Co. v. Pampered Chef, Ltd*., 2005 WL 82136 (D. Kan. Jan. 12, 2005); and *Kroeze v. Chloride Group Limited*, 572 F.2d 1099 (5th Cir. 1978).  The pertinent facts in each of these cases are easily distinguishable from the facts presented here and, for that reason, the cases are not persuasive to the court in resolving defendants' motion. *Wachter Management* does not even address the question of whether a particular offer specifies an exclusive manner of acceptance.  In that case, a software services company issued a proposal to a construction management company and a representative for the construction management company signed the written proposal as requested by the software company.  *Wachter Management*, 144 P.3d at 749.  The dispute in that case involved the terms of a subsequent "shrinkwrap" agreement which was shipped with the software purchased by the construction management company.  *See id*. at 750.  The specific language of the initial proposal was never addressed by the court and the parties did not dispute that an agreement was formed by virtue of the signature on the proposal.  *See id*. at 751.  In *Home Basket*, the defendant maintained an online purchase order management system such that the only way in which a purchase order could be accepted was through "clicking" the "Accept P.O." button at the end of the terms and conditions field on the defendant's website.  *Id*. at *1.  Clearly, those purchase orders stated a specific manner of acceptance—in fact, no other manner of acceptance was even possible.  *See*

11

*id*. at *3.  Finally, *Kroeze* involved an offer for the sale of shares of stock and the detailed tender offer expressly stated (in multiple provisions) that agreement was contingent upon the stockholder executing and returning a transmittal letter.  572 F.2d at 1102-03.  None of these cases, then, advance the argument made by defendants—that the specific language used in plaintiff's quote mandates an exclusive manner of acceptance.

While Kansas courts have had no occasion to address the principles concerning exclusive and permissive manners of acceptance, the Tenth Circuit, applying Oklahoma law, has analyzed strikingly similar language and has held that such language is permissive.  In *Mid-Continent Petroleum Corporation v. Russell*, 173 F.2d 620 (10th Cir. 1949), the Circuit analyzed a letter sent by the plaintiff to the defendant concerning an oil and gas lease.  The letter concluded by stating that if the provisions set forth in the letter "meet with your approval, please accept the duplicate counterpart hereof and return the same to us within Ten (10) days from this date."  *Id.* at 623.  Contrasting this language with the language utilized by the plaintiff in a prior letter (a letter that expressly stated that the terms of the letter were not binding on the plaintiff unless the defendant signed and returned a copy of the letter within 10 days of the date of the letter), the Circuit explained that the language "merely requested that [the defendant] accept the duplicate counterpart and return it within ten days.  It did not expressly exact or require that it be accepted in writing and within ten days, and therefore it did not prescribe an exclusive manner and time of acceptance."  *Id.* at 623-24.

The language utilized in plaintiff's quote is analogous to the language analyzed in *Russell*.[6]   Significantly, the language requests acceptance in a certain manner, but does not preclude other methods of acceptance.  The language does not indicate that the quote is binding only upon a signed and returned copy of the quote and there is simply nothing in the language that "unambiguously" requires a signed and returned copy as a condition of acceptance.  Other cases analyzing similar language have reached the same conclusion.  *See Kilgallen v. Network Solutions, Inc.*, 99 F. Supp. 2d 125, 128-29 (D. Mass. 2000) (valid acceptance despite plaintiff's failure to include paper remittance stub with check payment; instructions asked registrants to include stub but did not state that checks received without stub would be rejected; thus, offer did not preclude plaintiff from accepting offer by mailing check without stub); *McAfee v. Brewer*, 203 S.E.2d 129, 131 (Va. 1974) (finding valid acceptance where the defendant did not sign and return a copy of the contract as plaintiff's offer requested because the contract did not state that the failure to do so would nullify the offer); *see also* 2 Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 2-206:59 (3rd ed. 2012) (fact that offer states that the offeree should sign and return the offered contract does not make that the exclusive method of acceptance).

Given Article 2's clear preference for "any reasonable manner of acceptance" under the circumstances, and because plaintiff's quote does not "unambiguously" indicate that signing, dating and returning the quote is the sole or exclusive manner of acceptance, the court believes

---

[6] While *Russell* did not arise under Article 2 of the UCC, the court discerns no substantive difference between the common law principles applied in *Russell* and those set forth in the UCC. *See* 2 *Williston on Contracts* § 6.12 (4th ed. 2015) (principles governing exclusive manner of acceptance are largely the same under common law, the Restatement and the UCC).

that the Kansas Supreme Court, if faced with the issue, would conclude as a matter of law that the quote did not contemplate acceptance exclusively through the signing, dating and returning of the form.  Defendants' motion for summary judgment, then, is denied.  Whether defendants accepted plaintiff's quote through some means other than signing and returning the form—an issue on which defendants have not moved for summary judgment—is for the jury to decide.

B.    *Plaintiff's Claim for Damages*

In the pretrial order, plaintiff seeks damages based on the "unfulfilled contract value" of the parties' contracts.  According to defendants, plaintiff cannot recover any damages for profits that plaintiff would have earned from the parties' contracts because the limitation of damages provision in the Terms and Conditions set forth in the purchase order signed by Mr. Famiglietti expressly bar such damages.  That provision, found in Article 12.2 of the terms and conditions, states:

> NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES SUSTAINED BY THE OTHER (OR ITS AFFILIATE) IN CONNECTION WITH THE PERFORMANCE OF THE AGREEMENT INCLUDING WITHOUT LIMITATION BUSINESS INTERRUPTIONS, LOSS OF PROFITS, LOSS OF REVENUES, LOSS OF USE OF ASSETS AND LOSS OF CONTRACTS.

It is undisputed that plaintiff is seeking profits lost as a result of the breach asserted by plaintiff. Defendants, then, contend that such damages are not recoverable because Article 12.2 precludes the recovery of consequential damages, which are defined to include "loss of profits."  The court rejects defendants' interpretation of this provision and denies the motion for summary judgment on this issue.

14

Both parties acknowledge that a discussion of defendants' argument necessarily must begin with the Tenth Circuit's opinion in *Penncro Associates, Inc. v. Sprint Spectrum, L.P.,* 499 F.3d 1151 (10th Cir. 2007). In *Penncro*, the Circuit affirmed this court's conclusion that a limitation of damages provision that defined consequential damages to include "lost profits" did not foreclose an award of profits lost as a direct result of a contractual breach. *See id.* at 1152. The provision in *Penncro* is nearly identical to the provision here—the provision barred consequential damages and defined such damages to "include, but are not limited to, lost profits, lost revenues and lost business opportunities." *See Penncro Associates, Inc. v. Sprint Corp.* 2006 WL 416227, at *6 (D. Kan. Feb. 22, 2006). Faced with the same argument advanced by defendants here, this court held (in some detail that need not be reiterated here) that the provision simply defined consequential damages "as that phrase is commonly understood under Kansas law—that is, damages for economic harm suffered by a party beyond direct economic loss or ordinary loss of bargain damages." *Id.* The court, then, rejected an interpretation of the provision as precluding recovery of direct lost profits and direct lost revenues. *See id.* at *7. Affirming this court, the Tenth Circuit held that the limitation of damages provision unambiguously precluded only the recovery of consequential lost profits and did not speak to "direct lost profits." *Penncro*, 499 F.3d at 1156.

Defendants attempt to distinguish *Penncro* in two ways. First, defendants contend that this court and the Circuit were not asked to resolve the threshold question of whether lost profits are always considered consequential damages under Kansas law—a question that defendants contend must be answered in the affirmative. The court rejects this argument. While the Circuit

may not have expressly resolved that question, it impliedly did so. *See id.* at 1156. As explained by the Circuit:

> Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract. Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages. Thus, for example, if a services contract is breached and the plaintiff anticipated a profit under the contract, those profits would be recoverable as a component of direct, benefit of the bargain damages. If that same breach had the knock-on effect of causing the plaintiff to close its doors, precluding it from performing other work for which it had contracted and from which it expected to make a profit, those lost profits might be recovered as "consequential" to the breach. All of this is by way of saying that, under the circumstances we face here, a reading of Section 13 informed by the normal legal meaning of its terms suggests that it bars only the recovery of consequential lost profits, not direct lost profits. Section 13 says that no consequential damages are recoverable, "includ[ing]" lost profits; it simply does not speak to direct damages, or to lost profits recoverable under such a theory.

*Id.* Clearly, the Circuit held that lost profits are recoverable under Kansas law as direct, benefit of the bargain damages. Stated another way, no reasonable argument can be made that lost profits are "always" considered consequential damages under Kansas law. Any lingering doubt over this question is completely resolved by the Kansas case cited by the Circuit in *Penncro—Source Direct, Inc. v. Mantell*, 870 P.l2d 686 (Kan. App. 1994) ("A party who seeks to recover his expectation interest in the contract is asking to be given the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed. Expectation damages usually consist of lost profits plus any incidental or consequential losses caused by the breach. In Kansas, loss of profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties." (citations

omitted)).[7]

Defendants also contend that the "damage model" at issue in *Penncro* is not the same as the damage model presented by plaintiff in this case. According to defendants, Penncro concerned "a bill collection service contract where direct lost profits were calculated based upon the lost revenue set forth in the service contract, less avoidance cost and less other work that was obtained through greater capacity caused by the lost contract. This case concerns goods fabricated by third parties and the profit to be derived therefrom." Defendants appear to suggest that a jury cannot arrive at a direct lost profits figure because plaintiff outsourced part of the work to a third party or that somehow plaintiff's decision to outsource part of the work renders its claim for lost profits a claim for incidental or consequential damages. Nothing about plaintiff's damages theory—or the manner in which plaintiff sought to fulfill its obligations under the contract—suggests that its claim for lost profits is incidental or consequential or somehow uncertain. Consistent with *Penncro*, plaintiff is permitted to seek lost contractual revenues, irrespective of the limitation of damages provision, based on plaintiff's anticipated profit under the contract alleged.

---

[7] Defendants direct the court to two Kansas cases for the principle that lost profits are always considered consequential damages under Kansas law. Neither case remotely stands for that principle. *See Kvassay v. Murray*, 808 P.2d 896 (Kan. App. 1991) (trial court erred in ruling that profits were not obtainable for goods that had not been produced; appropriate measure of damages for breach is the profit which the seller would have made from full performance by the buyer together with any incidental damages . . . due allowance for costs reasonably incurred and due credit for payments or proceeds of resale); *La Villa Fair v. Lewis Carpet Mills, Inc*., 548 P.2d 825 (Kan. 1976) (when seller breaches contract, buyer's lost profits are considered incidental damages from seller's breach).

For the foregoing reasons, the court denies defendants' motion for partial summary judgment on plaintiff's claim for damages.[8]

## IV.    Defendants' Motion to Exclude Testimony of Russ McCullough

Relying in large part on arguments asserted in their motion for summary judgment, defendants seek to exclude the testimony of Russ McCullough, plaintiff's damages expert.  To the extent defendants seek to exclude testimony concerning damages relating to plaintiff's promissory estoppel claim, the motion is granted as plaintiff has abandoned that claim and its claim for damages stemming from it.  The motion is otherwise denied.  In support of their motion, defendants contend that Mr. McCullough's opinions are based on the assumption that the parties entered into a contract based on the December 4, 2012 quote which, according to defendants, was never formed because defendants did not sign and return the quote.  According to defendants, then, any opinion concerning damages stemming from this breach is irrelevant because no contract existed.  As noted above, a jury must determine whether defendants accepted plaintiff's December 4, 2012 offer.  This argument is rejected.

Defendants further seek to exclude any testimony concerning lost profits because that category of damages is expressly barred by the limitation of damages provision set forth in Article 12.2 of the terms and conditions attached to the August 26, 2012 purchase order.  The court has rejected defendants' interpretation of Article 12.2 and has concluded that plaintiff may seek lost profits as direct, benefit of the bargain damages.  This argument, then, is also rejected.

---

[8] In just two sentences, defendants move for summary judgment on plaintiff's claim for damages resulting from unpaid invoices because, according to defendants, all invoices have been paid in full.  Defendants have not shown the absence of a factual dispute on this issue.

Finally, defendants assert that Mr. McCullough's opinion that plaintiff's stated "markup" of 35.88-47.37% on its products is "within reason" is tantamount to a guess and must be excluded because he admits that here is no reliable data available on industry markup values for the gun manufacturing industry.   This is not a basis to the exclude the testimony.   Mr. McCullough states in his opinion that he based the opinion on anecdotal evidence as well as papers available in "scholarly literature" in the metal industry.   While defendants may certainly cross-examine Mr. McCullough on the basis for his opinion, defendants have not persuaded the court that it should be excluded as unreliable.   *See Hartzler v. Wiley*, 277 F. Supp. 2d 1114, 1118-19 (D. Kan. 2003) (refusing to exclude expert testimony on reasonableness of price markups even though opinion did not identify any studies or industry data to support opinion but expert had lengthy experience in industry).

## V.      Plaintiff's Motion for Summary Judgment on Counterclaims

In the pretrial order, defendants assert that plaintiff breached the implied warranty of merchantability under K.S.A. § 84-2-314 and the implied warranty of fitness for a particular purpose under K.S.A. § 84-2-315.   Specifically, defendants allege that plaintiff breached these warranties in six respects: (1) supplying carriers and gas keys that had out-of-specification areas which drastically compromised the functional aspects of the components and the mating with other parts; (2) using (or outsourcing to a company that used) an improper plating process; (3) using improper material for the bolts; (4) manufacturing bolts and cam pins that had out-of-specification dimensions that made them unsuitable for use; (5) lacking an adequate quality

control process that would have avoided the foregoing problems; and (6) the untimely delivery of the parts.

As a threshold matter, defendants move to strike plaintiff's statement of uncontroverted facts on the grounds that plaintiff has improperly asserted facts that are immaterial, inadmissible and not concise in violation of Local Rule 56.1.  Defendants primarily challenge plaintiff's practice of tracking verbatim lengthy e-mail communications between the parties and presenting each email communication in one "factual statement" (that sometimes spans multiple pages) despite the fact that the email communications contain numerous, separate factual statements. Defendants contend that plaintiff's approach improperly asks the court to consider the entire record before it, even those portions that are irrelevant or inadmissible, and that it is impossible for defendants to adequately address plaintiff's statement of facts.  In response, plaintiff urges that it has followed the pertinent rules and, to the best of its ability, has presented to the court the facts of a case that, for better or worse, is based in large part on lengthy email communications between and among the parties over the course of more than one year.  Plaintiffs also highlight that the rule, contrary to defendants' suggestion, does not require "one fact per paragraph" but only a "concise statement of facts" that are numbered and that refer with particularity to the record. Finally, plaintiffs note that defendants have not suggested that plaintiff's misquoted or mischaracterized any email communication utilized in its factual statement.

The motion is denied.  While the court concludes that plaintiff has not strictly complied with Local Rule 56.1, the court understands why plaintiff, given the nature and significance of the communications between the parties in this case, presented the record to the court in the manner in which it did.  Plaintiff is cautioned, however, that in the future it should seek

permission from the court prior to utilizing such an approach when it intends to file a summary judgment motion that relies in large part on material that is not easily consolidated or reduced to short, concise factual paragraphs.  Moreover, the court finds that the approach utilized by plaintiff did not hamper defendants' ability to respond to the motion and it did not hamper the court's ability to understand and resolve plaintiff's motion.  The court turns, then, to the substance of the motion and refuses to strike any facts therein.

In their motion for summary judgment, plaintiffs ask the court to resolve two overarching issues pertinent to the warranty counterclaims.  First, plaintiff asks the court to "summarily find the existence" of a "contract with NFA and a contract with NFA/EXTAR."  Plaintiff sets forth no argument or authority in support of its request but simply refers the court back to 27 factual statements in its statement of facts.  Because this issue has not been adequately briefed, the court declines to address it.  *Richardson v. Gallagher*, 553 Fed. Appx. 816, 829 (10th Cir. 2014); *United States v. Cooper,* 654 F.3d 1104, 1128 (10th Cir. 2011).  Moreover, even if the court were inclined to address this argument, the record does not reflect that plaintiff would be entitled to summary judgment.  As noted earlier in connection with defendants' motion for summary judgment, factual disputes exist as to whether a contract was formed with the terms set forth in the December 4, 2012 quote concerning the short pistol project.  To the extent that plaintiff seeks a determination that a contract was formed with New Frontier with the terms set forth in the August 26, 2012 purchase orders, factual disputes exist concerning whether the parties agreed to the specific terms set forth in those agreements or whether the parties understood, at the time of signing, that the specific terms would vary from those set forth in the purchase orders.

Second, plaintiff asks the court to find that New Frontier and EXTAR were engaged in a joint venture or agency relationship in connection with the short pistol project. A joint venture is "an association of two or more persons or corporations to carry out a single enterprise for profit." *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc*., 596 P.2d 816, 823 (Kan. 1979). A joint venture may only exist by agreement of the parties, and where its existence is controverted, can be found through the mutual acts and conduct of the parties. *George v. Capital South Mortgage Invs., Inc*., 961 P.2d 32, 44 (Kan. 1998). Although no particular factor is determinative, conduct or acts indicative of a joint venture include: (1) the joint ownership and control of property; (2) the sharing of expenses, profits, and losses; (3) a community of control over and active participation in the management direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement. *Cinderella Homes*, 596 P.2d at 823.

In support of its argument that New Frontier and EXTAR were engaged in a joint venture or agency relationship in connection with the pistol project, plaintiff directs the court to evidence in the record that New Frontier and EXTAR shared expenses for the bolts; that Mr. Famiglietti and Mr. Zeman considered themselves "partners" on the project; that Mr. Famiglietti secured funding on behalf of EXTAR for the project; that Mr. Famiglietti, with Mr. Zeman's approval, actively participated in the development (in terms of obtaining parts), marketing and selling of the pistols; and that Mr. Famiglietti, in numerous communications with plaintiff, communicated on behalf of Mr. Zeman with respect to issues concerning the pistol project. As the non-moving parties, however, defendants are entitled to have the evidence viewed in the light most favorable to them. That evidence suggests that the relationship between New Frontier

22

and EXTAR was one of distributor-manufacturer that is governed solely by the parties' Distribution Contract.   Pursuant to that agreement, and as explained by Mr. Zeman, EXTAR conceived, designed and manufactured the pistol entirely on its own and NFA was designated as the exclusive distributor of that pistol for a term of one year.   New Frontier was obligated by contract to purchase a minimum of 2000 pistols and to provide a 50 percent deposit on 2000 pistols, with the balance due after receiving the pistols.   Mr. Famiglietti disputes that New Frontier "funded" the project in any respect.   Clearly, factual issues exist as to whether New Frontier and EXTAR were engaged in a joint venture or agency relationship.   Plaintiff has not shown that it is entitled to summary judgment on this issue.

A.      *Failure to Pay*

Plaintiff moves for summary judgment on defendants' warranty counterclaims on the grounds that Article 8 of the terms and conditions attached to the August 26, 2012 purchase orders expressly states that warranty claims for defective work and materials are conditioned on full and complete payment by the buyer.   According to plaintiff, defendants cannot assert any warranty claims because they have not made full payment to plaintiff.   In support of that assertion, plaintiff directs the court to deposition testimony suggesting only that EXTAR owed and failed to pay a considerable sum for parts relating to the short pistol project.   With respect to New Frontier, then, plaintiff has not shown for summary judgment purposes that the warranty provision in Article 8 precludes the assertion of warranty claims.   And although the evidence demonstrates that EXTAR failed to render full payment to plaintiff in connection with the short pistol project, factual disputes exist as to whether EXTAR is bound by Article 8 in the first

instance.[9]  It is undisputed that Mr. Zeman did not sign the terms and conditions attached to the August 26, 2012 purchase orders and he did not sign any purchase order or quote from plaintiff concerning the bolts or the carriers.  Mr. Zeman asserts that he had no knowledge of those terms and conditions until this litigation commenced.  Although EXTAR may ultimately be bound by the terms and conditions by virtue of a joint enterprise or agency relationship with New Frontier, that fact, as noted above, cannot be resolved at this juncture.

B.    *Alleged Delay in Providing Notice of Defects*

Plaintiff further contends that any warranty claims concerning improper materials or specifications are barred under K.S.A. § 84-2-607(3)(a).  That provision requires a buyer to notify a seller of any breach "within a reasonable time after he discovers or should have discovered any breach."  According to plaintiff, defendants did not notify plaintiff of any defects concerning materials or specifications until at least three months after accepting the carriers and bolts.  Viewing the evidence in the light most favorable to defendants as the non-moving parties, a jury could reasonably conclude that defendants provided the requisite notice to plaintiff within a reasonable period of time.  Defendants' evidence suggests that, while the bolts were functioning properly when used in firearms with lower pressured gas systems, the bolts functioned differently (and, allegedly, defectively) when used in the short pistol—a distinction that defendants did not discover until they were able to use the bolts in the short pistol.

---

[9] Plaintiff contends that EXTAR is precluded from asserting that Article 8 does not apply to it when EXTAR, in its own motion, contends that Article 12 applies to the parties' relationship and bars plaintiff from recovering lost profits.  At this juncture, nothing precludes defendants from asserting mutually exclusive defenses to plaintiff's claims.

Moreover, defendants could not use the bolts in the short pistol until plaintiff delivered other custom components (such as the carrier and gas keys) necessary to the functioning of the short pistol.  The record is not clear as to when defendants had all the necessary parts to fully utilize and test the short pistol with the parts supplied by plaintiff.   The circumstances here, then, preclude a finding as a matter of law that defendants' notice was untimely under K.S.A. § 84-2-607(3)(a).  *See Golden v. Den-Mat Corp.*, 276 P.3d 773, 788 (Kan. App. 2012) (Kansas courts commonly consider determinations of reasonable time under § 2–607(3)(a) and under the UCC generally to be within the province of the factfinder); *see also* 4 David Frisch, *Lawrence's Anderson on the Uniform Commercial Code* § 2-607:32 (3rd ed. 2014) (question of what is a "reasonable time" in which a buyer is to give notice to the seller of breach of warranty so as to not be barred from recovering for breach is a question of fact for jury based on surrounding circumstances).[10]


C.    *Approval of Samples*

Next, plaintiff contends that defendants' warranty claims are barred under K.S.A § 84-2-316(3)(b) because defendants approved sample parts provided by plaintiff and no deviations from those sample parts occurred.  That provision of the UCC provides that "when the buyer before entering into the contract has examined the goods or the sample or model as fully as he

---

[10] In its motion for summary judgment, plaintiff contends that defendants' three-month delay in providing notice of defects was unreasonable.  In its reply brief, plaintiff appears to suggest for the first time that defendants never provided any notice of the specific warranty claims identified in the pretrial order.  The court will not consider this argument.  *Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013) (court does not consider arguments raised for the first time in reply brief).

desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." According to plaintiff, an inspection of the samples provided "surely" would have revealed any alleged defects. This argument is not persuasive. The record does not reflect that New Frontier received any sample parts. While the record reflects that EXTAR received a sample of a modified carrier for the short pistol, the defects described by defendants with respect to the carrier would not have been revealed by virtue of an inspection. Those alleged defects were revealed only when the carrier was fully integrated into the short pistol with other component parts. The record does not demonstrate that EXTAR received any other sample parts. In light of such circumstances, plaintiff cannot establish at this juncture that the K.S.A. § 2-316(3)(b) precludes defendants' warranty claims.

D.    *Untimely Delivery*

Plaintiff also contends that defendants cannot assert any warranty claims based on a theory of untimely delivery because any delays in delivery were beyond plaintiff's control. As a threshold matter, none of the parties have addressed whether the untimely delivery of goods is sufficient to state a claim for breach of warranty. The court defers resolution of that issue until trial. Assuming at this juncture that untimely delivery can constitute a breach of warranty, plaintiff is not entitled to summary judgment on that issue. Plaintiff asserts that delivery delays were due to EXTAR's changes to the short pistol plans and the fact that plaintiff's subcontractors delivered parts to plaintiff that required repair. In support of its motion, plaintiff relies on Article 15.2 of the terms and conditions attached to the August 26, 2012 purchase

26

orders, which generally precludes liability for any delay if that delay is caused by an "unforeseeable" event beyond the control of the party.  This argument is rejected.  First, plaintiff concedes in its motion that, even under its theory of when the parts were due to be delivered, it delivered carriers and gas keys at least two weeks late.  Second, factual disputes exist over whether EXTAR is bound by the terms and conditions in any event.  Finally, viewing the evidence in the light most favorable to defendants, there is evidence in the record demonstrating that some of the delay in delivery was the fault of plaintiff.  Particularly, the evidence demonstrates that plaintiff experienced numerous delays on its end resulting from the use of slow machinery and, once that machinery was replaced, the malfunction of new machinery.  In essence, the evidence viewed in the light most favorable to defendants suggests that plaintiff simply could not manufacture the volume of product desired by defendants in the time frame desired by defendants.  In such circumstances, the court cannot conclude as a matter of law that Article 15.2 precludes any warranty claim based on the timing of plaintiff's delivery of parts.

E.      *Failure to Conform to Military Specifications*

Plaintiff moves for summary judgment to the extent that defendants' counterclaims are based on plaintiff's failure to adhere to military design specification ("Mil-Spec") requirements in terms of materials utilized in manufacturing the firearm parts.  According to plaintiff, defendants were notified by plaintiff in November 2012 that plaintiff did not intend to utilize "mil-spec" material for the bolts and defendants never objected to this approach.  As highlighted by plaintiff, Mr. Everhart, on November 12, 2012, sent a detailed e-mail to New Frontier in which he described the materials he was using on all parts of the bolt carrier group.  With

respect to the bolts, Mr. Everhart expressly indicated that he was not using the material "called out in the mil-spec" and he explained his reasoning for that decision.  There is no evidence in the record that New Frontier ever objected to this approach and defendants do not address this argument whatsoever in its response to the motion for summary judgment.  Summary judgment, then, is appropriate with respect to any warranty claim based on plaintiff's failure to use material for the bolts that conform to military specifications.[11]  Defendants may still pursue a theory that plaintiff used improper material for the bolts, but they cannot suggest that such material was improper based on its failure to conform to military specifications.

F.      *Revocation of Acceptance*

        Relying on K.S.A. § 84-2-608, plaintiff seeks a ruling that defendants never revoked acceptance of the bolts and other allegedly defective parts that were delivered and that it is "too late" to do so now.  Defendants do not suggest that they ever revoked acceptance and the pretrial order does not suggest that defendants are seeking damages for which revocation of acceptance or rejection of goods is a prerequisite (i.e., recovery of the purchase price).  *See Genesis Health Clubs, Inc. v. LED Solar & Light Co*., 2014 WL 1246768, at *6-7 (D. Kan. Mar. 26, 2014) (plaintiff that did not effectively revoke acceptance of goods could not recover the purchase price of those goods).  This issue, then, is moot.

---

[11] Summary judgment on this claim is appropriate for the additional reason that the claim is not preserved in the pretrial order, which makes no mention of military specifications or plaintiff's failure to conform to such specifications.  Thus, any claim by New Frontier or EXTAR based on plaintiff's failure to design or manufacture "mil-spec" parts has been waived.  *See Genesis Health Clubs, Inc. v. LED Solar & Light Co*., 639 Fed. Appx. 550, 555 (10th Cir. Feb. 1, 2016).

G.    *Plaintiff's Right to Cure Defects*

Plaintiff seeks a determination that it had a "right" to cure any alleged defects in the bolts and that defendants denied plaintiff the right to do so.  Relying on this court's opinion in *Genesis*, 2014 WL 1246768, at *6-7, plaintiff contends that summary judgment is appropriate on all claims because defendants failed to provide plaintiff an opportunity to correct any alleged defects.    Plaintiff misconstrues *Genesis*, wherein the court held only that a buyer's failure to revoke acceptance meant that the buyer could not recover the purchase price of the goods but could seek breach-of-warranty damages.  *Id*. at *7-8; *accord* 4 David Frisch, *Lawrence's Anderson on the Uniform Commercial Code* § 2-608:59 (3rd ed. 2014) (buyer may recover damages for breach of warranty as to accepted goods or he may revoke acceptance or reject goods, but he cannot reject or revoke and also obtain breach of warranty damages).  Finally, a seller's right to cure arises only when a buyer rejects the goods or revokes acceptance of the goods—neither of which occurred in this case.  3A David Frisch, *Lawrence's Anderson on the Uniform Commercial Code* § 2-508:6 (3rd ed. 2014) (seller's right to make curative tender arises only when the buyer has rejected the goods).   Similar to plaintiff's revocation of acceptance argument, then, this issue is moot.


H.    *Quality Control Processes*

The final issue raised by plaintiff in its motion concerns defendants' theory that the defects alleged were caused in whole or in part by plaintiff's failure to maintain adequate "quality control processes" that might have prevented the defects from occurring.  Plaintiff moves for summary judgment on this theory because the witnesses identified by defendants in

support of this theory are not qualified to testify about it—an issue that has been raised by plaintiff in its motion to exclude those experts from testifying.  Both parties then simply refer the court to the submissions relating to the motion to exclude, but plaintiff also suggests that summary judgment is appropriate in any event because there is "no evidence" of any inadequate quality control processes on the part of plaintiff.

Because this issue has no bearing on plaintiff's liability or the damages that defendants may recover based on that liability, it is not an issue that is pertinent at the summary judgment stage.  Stated another way, the pertinent question with respect to the warranty claims is whether the goods met the particular purpose for which the goods were bought and/or whether the goods were unmerchantable or unfit for their intended purpose.  Any asserted reason for plaintiff's alleged breach (*i.e.*, lack of quality control processes) is not relevant to a liability determination and the jury will not be asked to resolve that issue.  Whether specific testimony about plaintiff's quality control processes might be relevant and admissible with respect to some other issue or in the broader context of the case is an issue that the court will address in connection with the motion to exclude.  But for summary judgment purposes, that issue holds no significance and the motion is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for partial summary judgment (doc. 147) is granted in part and denied in part; defendants' motion to exclude the testimony of Russ McCullough (doc. 149) is granted in part and denied in part; defendants' motion to strike (doc. 179) plaintiff's response to defendants' statement of uncontroverted facts is denied;  plaintiff's motion for partial summary judgment on defendants'

counterclaims (doc. 153) is granted in part, denied in part and moot in part; and defendants'

motion to strike plaintiff's statement of uncontroverted facts (doc. 165) is denied.

**IT IS SO ORDERED.**

Dated this 28th day of September, 2016, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge